PREET BHARARA JUDGE FORREST      13 CV 3069
United States Attorney for
the Southern District of New York

By:   CAROLINA A. FORNOS
      Assistant United States Attorney
      One St. Andrew's Plaza
      New York, New York 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA                    :

            - v. -                          :

ALL RIGHT, TITLE, AND INTEREST              :
IN THE BUSINESS KNOWN AS THE                    13 Civ.
RASPUTIN RESTAURANT/NIGHTCLUB AS            :
SET FORTH IN SCHEDULE A,
                                            :

ALL RIGHT, TITLE, AND INTEREST              :
IN BANK ACCOUNTS HELD IN THE
NAME OF MISSION SETTLEMENT                   :
AGENCY, a/k/a "Mission Abstract             :
LLC," a/k/a "Alpha Debt
Settlement," AND OTHERS AS SET              :
FORTH IN SCHEDULE B;
                                            :

ALL RIGHT TITLE AND INTEREST IN             :
THE REAL PROPERTY AND
APPURTENANCES LISTED IN SCHEDULE            :
C, TOGETHER WITH ALL                        :
IMPROVEMENTS AND APPURTENANCES
THERETO,                                    :

            Defendants-in-rem.              :
- - - - - - - - - - - - - - - -x

RECEIVED

MAY - 7 2013

U.S.D.C. S.D. N.Y.
CASHIERS

VERIFIED COMPLAINT

      Plaintiff United States of America, by its attorney,

Preet Bharara, United States Attorney for the Southern District

of New York, for its complaint alleges as follows:

## I. NATURE OF THE ACTION

      1.   This is an action by the United States of America

seeking forfeiture of:

a.   All right, title, and interest in the business known as the Rasputin Restaurant and Nightclub ("Rasputin Nightclub") as set forth in Schedule A;

b.   All right title and interest in bank accounts held in the name of MISSION SETTLEMENT AGENCY, a/k/a "Mission Abstract LLC," a/k/a "Alpha Debt Settlement," and others as set forth in Schedule B (the accounts in Schedule B, collectively, the "Target Accounts");

c.   All right title and interest in the real property and appurtenances listed in Schedule C, together with all improvements and appurtenances thereto (collectively, the "Target Properties");

(collectively, the "Defendant Property").

The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or derived from proceeds traceable to a conspiracy to commit wire fraud and mail fraud, in violation of 18 U.S.C. § 1349; mail fraud, in violation of 18 U.S.C. § 1341; and wire fraud, in violation of 18 U.S.C. § 1343. The Defendant Property is also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in money laundering.

## II.  <u>JURISDICTION AND VENUE</u>

2.   This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

3.   Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because actions giving rise to forfeiture took place in the Southern District of New York.

### III. PROBABLE CAUSE FOR FORFEITURE

4.    Since approximately September 2012, based upon a referral from the Consumer Financial Protection Bureau ("CFPB")[1], the United States Attorney's Office for the Southern District of New York has been investigating Mission Settlement Agency, a/k/a "Mission Abstract LLC," a/k/a "Alpha Debt Settlement," ("MISSION"), which held itself out as a company that could successfully negotiate to lower its financially disadvantaged customers' overall credit card debt, for mail and wire fraud offenses.   In connection with that investigation, the United States Attorney's Office, working with the United States Postal Inspection Service, executed a search warrant at MISSION's offices in Manhattan and Brooklyn in February 2013; recorded covert calls with MISSION employees, including calls made by an undercover law enforcement agent and by a cooperating witness who posed as a MISSION customer for several months[2]; reviewed numerous other records including of dozens of bank accounts; and

---

[1]   The Consumer Financial Protection Bureau (CFPB) was created in July 2010 after Congress passed and President Obama signed the Dodd-Frank Wall Street Reform and Consumer Protection Act.   The CFPB focuses on protecting American consumers in the market for consumer financial products and services.

[2]   The cooperating witness previously pleaded guilty in the United States District Court for the Southern District of New York to certain fraud crimes in an unrelated case, and has provided information to the Government regarding those and other crimes in the hopes of receiving a lesser sentence in that case. The information provided by the cooperating witness has proven accurate, reliable and corroborated by other evidence.

conducted numerous interviews of victims and former MISSION employees.

5.   On May 1, 2013, a grand jury sitting in this District returned an indictment (the "Indictment") charging MISSION, Michael Levitis ("LEVITIS"), Denis Kurlyand ("KURLYAND"), Boris Shulman ("SHULMAN"), and Manuel Cruz, a/k/a "James Leon," ("CRUZ") (collectively, the "Defendants") with conspiring to commit mail fraud and wire fraud in violation of 18 U.S.C. § 1349 (Count 1), mail fraud in violation of 18 U.S.C. § 1341 (Count 2), and wire fraud in violation of 18 U.S.C. § 1343 (Count 3). The Indictment, attached hereto as Exhibit A, is fully incorporated by reference herein.

<u>OVERVIEW OF THE SCHEME</u>

6.   As set forth in the Indictment, MISSION tricked financially suffering individuals into becoming customers by making material misrepresentations and omissions regarding its fees, results, and purported affiliations.   In connection with its misrepresentations about its affiliations, for example, MISSION sent a solicitation letter to individuals around the country that falsely suggested that MISSION was affiliated with the federal Government. Indictment ¶ 14.   A copy of that letter is attached hereto as Exhibit B.   As set forth in that letter, MISSION sent letters to prospective customers signed by a purported "Reduction Plan Administrator," sent from the so-called "Office of

-4-

Disbursement," with the envelope depicting an image of the Great Seal of the United States.  Exhibit B.

7.  Regarding the company's fees, and as set forth in the Indictment, MISSION sales representatives were instructed to make various misrepresentations about MISSION's fees.  A copy of a script recovered from LEVITIS's personal office during the search of MISSION offices is attached hereto as Exhibit C.  Upon information and belief, the handwriting on that script appears to be LEVITIS' handwriting, as corroborated by several former MISSION employees interviewed during the Government's investigation.

8.  Also in connection with the scheme, MISSION falsely assured its prospective customers that it could eliminate their debts and stop all debt collection calls to them.  At the same time, MISSION failed to advise them that a majority of its existing customers did not have any debts settled by MISSION, including because a large number of those customers terminated their relationships with MISSION after discovering that MISSION had lied about the fees it was charging them.  Also in furtherance of the scheme, at times, MISSION falsely assured customers that it would simply use the money paid by customers to pay the customers' creditors, less a small monthly fee. See Exhibit C.[3]

---

[3]  The script also reflects additional misrepresentations as to MISSION's affiliations, namely false suggestions of affiliation with one of the leading Credit Bureaus. Indictment ¶ 15; Exhibit C.

9.   In addition, in the course of the scheme, MISSION advised customers to stop communicating with their creditors and stop paying their bills, but did not advise customers of the serious and likely consequences of doing so.  As a result, among other things, many MISSION customers suffered damage to their credit and were sued by their creditors, and some fell into bankruptcy as a result of the Defendants' scheme.

### THE DEFENDANTS

10.   As set forth in the Indictment, between 2009 and May 2013, MISSION offered debt settlement services, through various offices located in Manhattan and Brooklyn, to financially disadvantaged individuals who were struggling or unable to pay their credit card debts.  Indictment ¶ 1.  MISSION held itself out as a company that could successfully negotiate to lower the overall debt that its customers owed to credit card companies and banks. Indictment ¶ 1.  As set forth above, however, the Defendants perpetuated a scheme to defraud over a thousand financially desperate people across the United States by making false assurances about MISSION's ability to reduce prospective customers's debt and making false statements about the fees MISSION would charge.  Indictment ¶¶ 6-7.

11.   At all times relevant to the Indictment, MISSION was operated and controlled by LEVITIS, despite having LEVITIS's mother listed as owner on certain corporate documents.  Indictment ¶ 2.

-6-

LEVITIS was responsible for the day-to-day operations of MISSION, including MISSION's finances, hiring and terminating employees, and advertising and solicitation of customers. Id.

12. KURLYAND was employed by MISSION as Vice President of Sales, and in that capacity, supervised certain MISSION sales representatives and coordinated MISSION's sales strategy, including arranging for solicitation letters to be mailed to prospective customers. KURLYAND reported directly to LEVITIS. Indictment ¶ 3.

13. SHULMAN was employed by MISSION as a sales representative, and in that capacity was responsible for the recruiting of prospective customers. SHULMAN reported to KURLYAND. Indictment ¶ 4.

14. Finally, CRUZ was a MISSION employee whose responsibilities included, among other things, assisting MISSION in customer solicitation. Indictment ¶ 5.

## THE DEFENDANTS' USE OF MONIES
## OBTAINED THROUGH THEIR FRAUDULENT SCHEME

15. As set forth in the Indictment, MISSION represented to customers that they would be asked to make an affordable monthly payment for a set period of time, and that these payments would be held in an account by a third party payment processor while MISSION negotiated down the customer's debt obligations, and thereafter, the money held in accounts would be used to pay the customer's creditors. Indictment ¶ 11. Instead, MISSION regularly took for itself – and for the personal benefit of the Defendants – money

that customers believed would be used to pay their creditors. Indictment ¶ 12. Thus, MISSION received up-front fees before any of the customer's debt was paid down. Id. As further set forth below, MISSION used the funds it obtained from unsuspecting customers to, among other things, pay for lavish personal items, operate the Rasputin Nightclub, and pay for the mortgages on real property.

## FRAUD PROCEEDS WERE TRANSFERRED TO THE RASPUTIN NIGHTCLUB

### THE RASPUTIN RESTAURANT AND NIGHTCLUB
2670 Coney Island Avenue
Brooklyn, New York

16.   As set forth in the Indictment, MISSION customers paid monies into accounts held by a third party payment processor, which were to be held in an account while MISSION negotiated down the customer's debt obligations.   Indictment ¶ 11. In total, based on information obtained from witness interviews and payment processors, MISSION used two different payment processors (the "PAYMENT PROCESSORS").

17.   Between mid-2009 and March 2013, approximately 2200 customers paid a total of over $14 million in connection with MISSION's purported debt settlement services. Of these funds, MISSION took for itself over $6.6 million in fees and paid only approximately $4.4 million to customers' creditors.   Further, for over 1200 of its customers, MISSION took fees totaling over $2.2 million but paid nothing to those customers' creditors as payment

for any negotiated debt. Indictment ¶ 8.

18.    Based on information provided by the PAYMENT PROCESSORS, the monies deposited by these customers - for whom no payments to creditors were ever made - were sent by the PAYMENT PROCESSORS to the following bank accounts:

a.    a bank account held at J.P. Morgan Chase Bank ending in 5351 under the name MISSION ABSTRACT LLC d/b/a MISSION SETTLEMENT AGENCY, with a business address of 4078 Nostrand Avenue, Brooklyn, New York (the "MISSION CHASE 5351 ACCOUNT"). In total, the PAYMENT PROCESSORS transferred more than $4 million into the MISSION CHASE 5351 ACCOUNT.

b.    A bank account held at Citibank ending in 2537 under the name MISSION ABSTRACT LLC, d/b/a MISSION SETTLEMENT AGENCY, with a business address of 292 Madison Avenue, 22nd Floor, New York, New York 10017 (the "MISSION CITI 2537 ACCOUNT"). In total, the PAYMENT PROCESSORS transferred more than $978,000 into the MISSION CITI 2537 ACCOUNT.

19.    A review of bank records for the MISSION CHASE 5351 ACCOUNT reveals that the Defendants made regular payments from the MISSION CHASE 5351 ACCOUNT to, among other things, the RASPUTIN NIGHTCLUB, a restaurant and nightclub located at 2670 Coney Island Avenue, Brooklyn, New York, owned by EVA LEVITIS, but believed to be operated by her son, LEVITIS and his wife, MARINA LEVITIS (the "RASPUTIN NIGHTCLUB").

20.   The payments to the RASPUTIN NIGHTCLUB were made through either (i) VERMAR MANAGEMENT LLC, the entity under which the RASPUTIN NIGHTCLUB does business and which holds the service mark and the liquor license for the RASPUTIN RESTAURANT, and which is owned in part by LEVITIS' mother, EVA LEVITIS, and his wife, MARINA LEVITIS; or (ii) AAMI, a prior business entity under which the RASPUTIN RESTAURANT did business. Specifically:

a.   More than $100,000 in checks, wire transfers and book transfers were made payable to VERMAR MANAGEMENT and/or VERMAR MANAGEMENT LLC from the MISSION CHASE 5351 ACCOUNT and deposited into an account ending in 9102 held at J.P. Morgan Chase Bank in the name of VERMAR MANAGEMENT LLC (the "VERMAR CHASE 9102 ACCOUNT").

b.   More than $8,000 in checks were written from the MISSION CHASE 5351 ACCOUNT made payable to AAMI RESTAURANT and deposited into an account ending in 1369 held at Capital One Bank.

### Vermar Management LLC d/b/a Rasputin

21.   Based upon publicly available information filed with the United States Patent and Trademark Office, www.uspto.gov, the service mark "RASPUTIN" for bar and restaurant services, is owned by "VERMAR MANAGEMENT, LLC DBA RASPUTIN LIMITED LIABILITY COMPANY NEW YORK 2670 Coney Island Avenue Brooklyn NEW YORK 11235."

22.   Further, based on documents maintained by J.P. Morgan Chase for the VERMAR CHASE ACCOUNT, Eva Levitis is listed as

a Manager of VERMAR MANAGEMENT, with a business address of 2670 Coney Island Avenue, as of December 2007.

23.    Records maintained by the New York State Liquor Authority reveal that as of 2007, VERMAR MANAGEMENT applied for a Liquor License for the RASPUTIN NIGHTCLUB, and EVA LEVITIS and MARINA LEVITIS, along with Faye Sherman and Vera Shapiro, were listed as the members of the VERMAR MANAGEMENT LLC, with MARINA LEVITIS as Manager.    Liquor License renewal documents filed for 2012 continue to reflect MARINA LEVITIS as Manager and EVA LEVITIS as member of the VERMAR MANAGEMENT LLC.

24.    Upon information and belief, however, Michael LEVITIS and his wife, MARINA LEVITIS, are believed to be the actual owners of the RASPUTIN NIGHTCLUB based on, among other things, their public representations on televised shows and/or public interviews, including an October 2011 interview of MICHAEL LEVITIS and MARINA LEVITIS held at the RASPUTIN NIGHTCLUB by a television show host, as well as MARINA LEVITIS's representations on the reality television show, "Russian Dolls," both of which are publicly available on the Internet.[4]

AAMI Restaurant LLC

25.    Additional bank account documents maintained by J.P. Morgan Chase for business account ending in 4665, held in the name

_____

[4]    See, e.g., http://www.youtube.com/watch?v=By9QF6UqiXc; http://www.youtube.com/watch?v=9AhW_5Dgl0c, last visited on May 7, 2013.

of AAMI Restaurant LLC d/b/a RASPUTIN, lists "Eva Levitis" as the VICE PRESIDENT in May 2007.

FRAUD PROCEEDS WERE TRANSFERRED TO THE TARGET ACCOUNTS

26. Monies deposited by the PAYMENT PROCESSORS into the MISSION CHASE 5351 ACCOUNT and the MISSION CITI 2537 ACCOUNT were also transferred to other accounts held by individuals and/or shell entities established by the Defendants and/or LEVITIS' law firm accounts. Specifically:

a. More than $400,000 in checks were made payable to the Law Office of Michael Levitis, deposited into an account at J.P Morgan Chase Bank ending in 5565 (the "LEVITIS LAW CHASE 5565 ACCOUNT"). Thereafter, approximately $10,000 in checks were made payable from the LEVITIS LAW CHASE 5565 ACCOUNT to VERMAR MANAGEMENT LLC between July 2009 and January 2010.

b. More than $150,000 in checks were made payable to Eva Levitis and deposited into a J.P. Morgan Account ending in 6565 (the "EVA LEVITIS CHASE 6565 ACCOUNT"). Thereafter, at least one payment was made from the EVA LEVITIS CHASE 6565 ACCOUNT to VERMAR MANAGEMENT in the amount of $3,000 on or about March 30, 2012.

c. More than $500,000 was transferred to Influential Division Corporation into various accounts at J.P. Morgan Chase Bank ending in 8195, 1519, 3130, and 6706. Bank records for those accounts, in turn, reveal that KURLYAND is the

President of this entity.   A review of these bank accounts do not appear to reflect any typical operating expenses but, rather, reflect debit transactions that appear to be for personal purposes, including purchases of retail goods including liquor and clothing, and charges at Atlantic City casinos.

d.   More than $70,000 was transferred to Madison Capital Agency, Inc., with a business address of 292 Madison Avenue, 22nd Floor, New York, New York 10017, and deposited into an account at J.P. Morgan Chase Bank ending in 4589.   Bank records show that MICHAEL LEVITIS is the Secretary of Madison Capital Agency and that Eva Levitis is a manager. A review of these bank accounts do not appear to reflect any typical operating expenses but, rather, reflect numerous checks made payable to Influential Enterprises, and the Law Office of Michael Levitis, among others.

e.   More than $600,000 in checks were made payable to Influential Enterprises.   At least some of these funds were deposited into an account ending in 1923 at J.P. Morgan Chase Bank, held in the name of Influential Enterprises.   Bank records for this account show that KURLYAND is the President of Influential Enterprises. A review of these bank accounts do not appear to reflect any typical operating expenses but, rather – and similar to Influential Division records – reflect debit transactions that appear to be for personal purposes, including purchases of retail goods including liquor and clothing, and charges at casinos.

f.   More than $80,000 was transferred to Prime Marketing Group Corporation with an address at 1001 Oriental Boulevard, Brooklyn, New York 11235 (Michael Levitis' residence), and deposited into an account at J.P. Morgan Chase ending in 8525. A review of bank records for this account reveals that Michael Levitis is the President, and Eva Levitis is named as the Secretary.

g.   More than $50,000 was transferred to Mission Marketing Center 102, Inc., an affiliate of MISSION, and deposited into an account at J.P. Morgan Chase Bank ending in 6403.

h.   More than $38,000 was transferred to Mission Settlement Agency 180 Inc., another affiliate of MISSION, and deposited into an account at J.P. Morgan Chase Bank ending in 4557.

i.   More than $44,000 in checks were made payable to YGIK Inc., another affiliate of MISSION.  At least some of these funds were deposited into an account ending in 9178 at TD Bank.

j.   More than $69,000 in checks were made payable to Susan V. Consulting, another affiliate of MISSION.  At least some of these funds were deposited into an account ending in 0539 at J.P. Morgan Chase Bank, in the name of Susan V. Consulting.

k.   Additional fraud proceeds were also deposited into accounts at Citibank ending in 2065 and 7376, in the name of Mission Abstract LLC, d/b/a Mission Settlement Agency and Alpha Funding Group, respectively, and at an account at Bethpage Federal

-14-

Credit Union ending in 8193 in the name of Santa Fe Consulting Corporation, all of which are known affiliates of MISSION.

27.   In addition to the bank accounts set forth above, bank records maintained by J.P. Morgan Chase for the MISSION CHASE 5351 ACCOUNT reveal that additional monies were directly or indirectly transferred to other bank accounts held and/or controlled by the Defendants and/or co-conspirators.   These accounts include:

a.   A bank account ending in 3465, held at J.P. Morgan Chase in the name of Michael Levitis and Marina Levitis.

b.   A bank account ending in 7765, held at J.P. Morgan Chase in the name of the Law Office of Michael Levitis.

c.   A bank account ending in 0130, held at Citibank in the name of Eva Levitis.

d.   A bank account ending in 7002, held at Citibank in the name of Michael and Marina Levitis (the "MICHAEL AND MARINA CITIBANK ACCOUNT"), discussed further below.

e.   A bank account ending in 1582, held at CitiBank in the name of Faye Levitis.

f.   Bank accounts ending in 0514 and 5009, held at J.P. Morgan Chase in the name of Denis Kurlyand.

28.   In addition, based on information provided by the PAYMENT PROCESSORS, fraud proceeds were also sent directly by the PAYMENT PROCESSORS to the following MISSION affiliates and bank

accounts:

a.   Alpha Debt Settlement, at a bank account ending in 5161 held at J.P. Morgan Chase.

b.   Mission Marketing Group Corporation, at a bank account ending in 9383, held at T.D. Bank.

c.   YGIK, Inc., at a bank account ending in 1205, held at PNC Bank.

d.   DIAS GROUP Inc., at a bank account ending in 6356, held at J.P. Morgan Chase bank.

e.   Stafecp, at Bethpage FCU, at a bank account ending in 8201, held at J.P. Morgan Chase bank.

f.   Mission Settlement Agency 180, at a bank account ending in 3301, held at Sun American.

g.   Alpine Processing, at a bank account ending in 6232, held at HSBC.

h.   Premier Debt Settlement, at a bank account ending in 7418, held at J. P. Morgan Chase.

i.   Debt Less USA, at a bank account ending in 3143, held at J.P. Morgan Chase.

j.   Debt Settlement Branch 101, at a bank account ending in 6284, held at J.P. Morgan Chase.

k.   GLOAD, at a bank account ending in 9265, held at J.P. Morgan Chase.

l.   Mission Settlement Agency, at a bank account

ending in 8399, held at Commerce Bank.

## FRAUD PROCEEDS WERE USED TO
## PAY FOR MORTGAGES ON REAL PROPERTY

29.   According to the records referenced below, the Defendants utilized proceeds they obtained by virtue of the scheme set forth in the Indictment to make mortgage payments for real property in Brooklyn, New York.

### The Oriental Boulevard Property

30.   Bank records maintained by J.P. Morgan Chase (previously Washington Mutual Bank) reveal that the holder of the mortgage of a property located at 1001 Oriental Boulevard, Brooklyn, New York 11235 (the "Oriental Boulevard Property") is J.P. Morgan Chase, and that the mortgage loan is held in the names of MICHAEL LEVITIS and MARINA LEVITIS.

31.   A review of the bank records for the MISSION CHASE 5351 ACCOUNT reveals that between August 2009 and January 2012, approximately $425,700 was transferred from the MISSION CHASE 5351 ACCOUNT to the LEVITIS LAW CHASE ACCOUNT. Thereafter, between January 2010 and March 2011, approximately $213,709.50 was transferred from the LEVITIS LAW CHASE ACCOUNT to the MICHAEL AND MARINA CITIBANK ACCOUNT.

32.   Additionally, between May 2010 and June 2012, approximately $41,660 was directly transferred from the MISSION CHASE 5351 ACCOUNT to the MICHAEL AND MARINA CITIBANK ACCOUNT. Thereafter, approximately 21 payments, totaling approximately

$186,794.76, were paid from the MICHAEL AND MARINA CITIBANK ACCOUNT to J.P. Morgan Chase loan account for the Oriental Boulevard Property.

33.  Based on these records, at least $186,794.76 in proceeds from the scheme were laundered through the Oriental Boulevard Property.

### The Norfolk Street Property

34.  Mortgage loan records filed by both HSBC and J.P. Morgan Chase (formerly Washington Mutual) reveal that the property located at 132 Norfolk Street, Brooklyn, New York 11235 (the "Norfolk Street Property") has mortgage loans held in the names of EVA LEVITIS, MICHAEL LEVITIS AND MARINA LEVITIS.

35.  From January 2009 through May 2012, EVA LEVITIS received approximately $258,088 from various bank accounts identified as being involved in the conspiracy or receiving victim funds, namely, the MISSION CHASE 5351 ACCOUNT and the LEVITIS LAW CHASE 5565 ACCOUNT.

36.  From January 2009 through January 2012, 10 payments totaling approximately $29,886.82 were made from the EVA LEVITIS CHASE ACCOUNT to the two mortgage holders on the Norfolk Street Property.

37.  Based on these records, at least $29,886.82 in proceeds from the scheme were laundered through the Norfolk Street Property by EVA LEVITIS.

### FRAUD PROCEEDS WERE ALSO SPENT ON LUXURY ITEMS

38.   Proceeds from the fraud were also used by the Defendants to pay for a luxurious lifestyle which included payments for luxury vehicles such as Mercedes Benz and a Bentley, travel to Florida, jewelry, retail stores, and fine dining.

### IV. CLAIMS FOR FORFEITURE

### FIRST CLAIM FOR RELIEF

Forfeiture Under 18 U.S.C. § 981(a)(1)(C) –
Mail Fraud, Wire Fraud, and Conspiracy
to Commit Mail and Wire Fraud

39.   Paragraphs 1 through 38 of this Complaint are repeated and realleged as if fully set forth herein.

40.   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . . 1344 of this title or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

41.   Title 18, United States Code, Section 1956(c)(7) defines the term "specified unlawful activity" to mean, in relevant part, "any act or activity constituting an offense listed in section 1961(1) of this title. . . ." Among the specified unlawful activity set forth in 18 U.S.C. § 1961(1) are 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

-19-

42.   Title 18, United States Code, Section 1341, provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or by private or commercial interstate carrier . . .
>
> shall be guilty of a crime.

43.   Title 18, United States Code, Section 1343, provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice
>
> shall be guilty of a crime.

44.     Title 18, United States Code, Section 1349, provides that:

> Any person who attempts or conspires to commit any offense under this chapter [including Sections 1341 and 1343] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

45.   By reason of the above, the Defendant Properties constitute, or are traceable to, the proceeds of wire fraud, mail

-20-

fraud, and a conspiracy to commit wire fraud and mail fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349, as well as property involved in money laundering. Accordingly, the Defendant Properties are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C).

<u>SECOND CLAIM FOR RELIEF</u>

Forfeiture Under 18 U.S.C. § 981(a)(1)(A) -
Money Laundering and Conspiracy

46.   Paragraphs 1 through 45 of this Complaint are repeated and realleged as if fully set forth herein.

47.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [Title 18, relating to money laundering offenses], or any property traceable to such property," is subject to forfeiture.

48.   Pursuant to Title 18, United States Code, Section 1956, commonly known as the "money laundering" statute, a crime is committed by a person who:

(a)(1)   .   .   .   knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(A)(i) with the intent to promote the carrying on of specified unlawful activity . . .

-21-

shall be guilty of a crime.

49.   Title 18, United States Code, Section 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

50.   Title 18, United States Code, Section 1957 further provides that "[w]hoever, . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b) [fine or imprisonment for not more than ten years]."

51.   The Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A) as they constitute property involved in, or property traceable to such property, financial transactions involving the proceeds of specified unlawful activity, namely the illegal conduct set forth in Claim One above, with such transactions intended to promote such specified unlawful activity and carried out with knowledge that the property represented the proceeds of illegal activity, and a conspiracy to undertake such transactions.  These transactions included, but are not limited to (1) engaging in a scheme to defraud customers and making representations as to fees, results, and affiliations, and using the mailing of solicitation letters;

and (2) using interstate wires, including telephone calls, to be made as part of making misrepresentations.

WHEREFORE, Plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Property and that all persons having an interest in the Defendant Property be required to appear and show cause why the forfeiture of the Defendant Property should not be decreed, that this Court decree forfeiture of the Defendant Property to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as it may deem just and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
        May 7, 2013

                              PREET BHARARA
                              United States Attorney for
                              the Southern District of New York
                              Attorney for the Plaintiff
                              United States of America

                    By:     _____
                              Carolina A. Fornos
                              Assistant United States Attorney
                              One St. Andrew's Plaza
                              New York, New York 10007
                              (212) 637-2740

VERIFICATION

STATE OF NEW YORK                    )

COUNTY OF NEW YORK                   )

SOUTHERN DISTRICT OF NEW YORK )

ROBERT M. CLARK, being duly sworn, deposes and says that he is a Special Agent of the United States Postal Inspection service and as such has responsibility for the within action; that he has read the foregoing Verified Complaint and knows the contents thereof; and that the same is true to the best of his own knowledge, information and belief.

The sources of deponent's information and the ground of his belief are official records and files of the United States and information obtained directly and indirectly by deponent during an investigation of alleged violations of federal criminal laws.

ROBERT M. CLARK
Postal Inspector
United States Postal Service

Sworn to before me this
7th day of May, 2013

NOTARY PUBLIC

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires May 8, 2014

SCHEDULE A

## All Assets of the Following Entities

1.   RASPUTIN, a restaurant and bar/nightclub located at 2670 Coney
     Island Avenue, Brooklyn, New York.

## SCHEDULE B

All right title and interest in the following bank accounts

| No. | Account Holder | Bank | Account No. |
|-----|----------------|------|-------------|
| 1. | Mission Abstract LLC d/b/a Mission Settlement Agency (the "MISSION CHASE 5351 ACCOUNT") | J.P. Morgan Chase | 809315351 |
| 2. | Mission Abstract LLC, d/b/a Mission Settlement Agency (the "MISSION CITI 2537 ACCOUNT") | Citibank | 4970602537 |
| 3. | Eva Levitis (the "EVA LEVITIS CHASE ACCOUNT") | J.P. Morgan Chase | 791005536565 |
| 4. | Eva Levitis | Citibank | 4970270130 |
| 5. | Influential Division Corporation | J.P. Morgan Chase | 803568195 |
| 6. | Influential Division Corporation | J.P. Morgan Chase | 910271519 |
| 7. | Influential Division Corporation | J.P. Morgan Chase | 839043130 |
| 8. | Influential Division Corporation | J.P. Morgan Chase | 809316706 |
| 9. | Influential Enterprises | J.P. Morgan Chase | 910271923 |
| 10. | Law Office of Michael Levitis (the "LEVITIS LAW CHASE 5565 ACCOUNT") | J.P. Morgan Chase | 791501275565 |
| 11. | Law Office of Michael Levitis | J.P. Morgan Chase | 052074897765 |

-25-

| No. | Account Holder | Bank | Account No. |
|-----|----------------|------|-------------|
| 12. | Madison Capital Agency Inc. | J.P. Morgan Chase | 892694589 |
| 13. | Prime Marketing Group Corp. | J.P. Morgan Chase | 429728525 |
| 14. | Michael Levitis and Marina Levitis | J.P. Morgan Chase | 791004723465 |
| 15. | Mission Marketing Center 102, Inc. | J.P. Morgan Chase | 808126403 |
| 16. | Mission Settlement Agency 180, Inc. | J.P. Morgan Chase | 824374557 |
| 17. | Susan V. Consulting | J.P. Morgan Chase | 839230539 |
| 18. | Vermar Management LLC (the "VERMAR CHASE 9102 ACCOUNT") | J.P. Morgan Chase | 751419102 |
| 19. | Denis Kurlyand | J.P. Morgan Chase | 828330514 |
| 20. | Denis Kurlyand | J.P. Morgan Chase | 2958735009 |
| 21. | Faye Levitis | Citibank | 4970301582 |
| 22. | Michael Levitis and Marina Levitis (the "Michael and Marina Levitis Citi Account") | Citibank | 42777002 |
| 23. | AAMI Restaurant LLC | Capital One Bank | 7164001369 |
| 24. | AAMI Restaurant LLC d/b/a Rasputin | J.P. Morgan Chase | 91070134665 |
| 25. | YGIK, Inc. | TD Bank | 373979178 |
| 26. | Mission Abstract LLC, d/b/a Mission Settlement Agency | Citibank | 4972722065 |
| 27. | Alpha Funding Group | Citibank | 4970617376 |

| No. | Account Holder | Bank | Account No. |
|---|---|---|---|
| 28. | Santa Fe Consulting | Bethpage Federal Credit Union | 9977838193 |
| 29. | Alpha Debt Settlement | J.P. Morgan Chase | 809315161 |
| 30. | Mission Marketing Group Corporation | T.D. Bank | 7930819383 |
| 31. | YGIK, Inc. | PNC Bank | 8622231205 |
| 32. | Dias Group Inc. | J.P. Morgan Chase | 857436356 |
| 33. | Stafecp | Bethpage FCU | 9977838201 |
| 34. | Mission Settlement Agency 180 | Sun American | 6702743301 |
| 35. | Alpine Processing | HSBC | 25046232 |
| 36. | Premier Debt Settlement | J. P. Morgan Chase | 826947418 |
| 37. | Debt Less USA | J.P. Morgan Chase | 801453143 |
| 38. | Debt Settlement Branch 101 | J.P. Morgan Chase | 796366284 |
| 39. | GLOAD | J.P. Morgan Chase | 151083769265 |
| 40. | Mission Settlement Agency | Commerce Bank | 4270188399 |

## SCHEDULE C

## All Right, Title, and Interest in the Following Real Property

1. All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 132 Norfolk Street, Brooklyn, New York 11235;

2. All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1001 Oriental Boulevard, Brooklyn, New York 11235;

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :          SEALED
                                                       INDICTMENT
        -v-                                 :
                                                       13 Cr.
MISSION SETTLEMENT AGENCY,                  :
    a/k/a "Mission Abstract LLC,"           :
    a/k/a "Alpha Debt Settlement,"          :
MICHAEL LEVITIS,
DENIS KURLYAND,                             :
BORIS SHULMAN, and
MANUEL CRUZ,                                :
    a/k/a "James Leon,"                     :

            Defendants.                     :

- - - - - - - - - - - - - - - - -x

## COUNT ONE
(Conspiracy to Commit Mail and Wire Fraud)

The Grand Jury charges:

### BACKGROUND

1.   At all times relevant to this Indictment, MISSION
SETTLEMENT AGENCY, a/k/a Mission Abstract LLC, a/k/a Alpha Debt
Settlement ("MISSION"), the defendant, was a company that
offered "debt settlement" services to financially disadvantaged
individuals who were struggling or unable to pay their credit
card debts.  Like other purported debt settlement providers,
MISSION held itself out as a company that could successfully
negotiate to lower the overall debt its customers owed to credit
card companies and banks.  MISSION was founded in or about 2009
and operated continuously, at various offices located in

1

Manhattan and/or Brooklyn, up to and including in or about May
2013.

2.    At all times relevant to this Indictment, MICHAEL
LEVITIS, the defendant, operated and controlled MISSION.
Although LEVITIS's mother was listed as MISSION's owner on
certain corporate documents, in truth and in fact, it was
LEVITIS who was responsible for managing MISSION's day-to-day
operations, its finances, its hiring and termination of
employees, and its advertising and solicitation of customers.

3.    At all times relevant to this Indictment, DENIS
KURLYAND, the defendant, was employed by MISSION as Vice
President of Sales.  In that capacity, among other things,
KURLYAND supervised certain MISSION sales representatives and
helped coordinate MISSION's sales strategy, including arranging
for solicitation letters to be mailed to prospective customers
on MISSION's behalf.  KURLYAND reported directly to MICHAEL
LEVITIS, the defendant.

4.    At all times relevant to this Indictment, BORIS
SHULMAN, the defendant, was employed by MISSION as a sales
representative.  In that capacity, SHULMAN was responsible for
recruiting prospective customers by phone, by email, and in
person.  SHULMAN reported directly to DENIS KURLYAND, the
defendant.

5.   At all times relevant to this Indictment, MANUEL CRUZ, a/k/a "James Leon," the defendant, was a MISSION employee whose responsibilities included, among other things, assisting MISSION with customer solicitation.

## OVERVIEW OF THE FRAUDULENT SCHEME

6.   From at least in or about 2009 up to and including in or about May 2013, MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, systematically exploited and defrauded over a thousand financially disadvantaged individuals across the country.  Preying upon the financial desperation of individuals struggling to pay their credit card debts, the defendants falsely and fraudulently tricked over a thousand such individuals into becoming MISSION's customers with significant -- but false -- assurances about MISSION's ability to help as well as about the fees MISSION would charge in exchange for that help.

7.   Specifically, and as set forth in greater detail below, (1) the defendants commonly lied about and/or concealed MISSION's fees, falsely indicating MISSION would charge a mere $49 per month, when in truth and in fact MISSION took thousands of dollars in fees from funds that its customers had set aside because they believed the funds would be used to pay creditors; (2) the defendants deceived prospective customers by

3

fraudulently promising that MISSION could help slash their debts -- typically by 45% -- when, for the majority of customers, MISSION actually did little or no work and failed to achieve any reduction in debt whatsoever; and (3) the defendants deceptively created an air of legitimacy for MISSION's business by, among other things, falsely suggesting that MISSION had affiliations with the federal government and a major credit bureau.

8. Overall, between approximately mid-2009 and March 2013, approximately 2200 customers paid a total of nearly $14 million in connection with MISSION's purported debt settlement services. Of these funds, MISSION took for itself over $6.6 million in fees and paid only approximately $4.4 million to customers' creditors. For over 1200 of its customers, MISSION took fees totaling nearly $2.2 million and has never paid a single penny to the customers' creditors as payment for any negotiated debt. Indeed, as a result of the defendants' scheme, most of MISSION's customers failed to achieve the reduction in debt that the defendants had promised them, and some of them suffered further declines in their credit ratings, were sued by their creditors, and/or fell into bankruptcy. Meanwhile, MICHAEL LEVITIS, the defendant, used the money that MISSION took from its customers to pay for, among other things, the operating expenses of a restaurant/nightclub he controlled, lease payments

for two different luxury Mercedes cars, and credit card bills for his mother.

## MEANS AND METHODS OF THE CONSPIRACY

9. MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, and others known and unknown, attempted to procure customers for MISSION as follows: They targeted financially disadvantaged individuals known to be struggling to pay credit card debt and reached out to them through, among other means, telemarketing and mail solicitations. Thereafter, MISSION's sales representatives typically spoke to the prospective customers on the phone, describing MISSION's work and its ability to renegotiate debt. Where an individual ultimately expressed an interest in engaging MISSION, MISSION then had the individual enter into a contract.

10. To successfully convince individuals to become MISSION customers, however, MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, and others known and unknown, made material misstatements and/or material omissions concerning a number of matters.

## Lies About MISSION's Fees

11. MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants,

and others known and unknown, made material misrepresentations and material omissions concerning MISSION's fees when soliciting prospective customers.  In solicitation letters and in phone conversations with prospective customers, MISSION represented that customers would be asked to make affordable monthly payments for a set period of time, that these payments would be held in escrow by a third party payment processor until MISSION had negotiated down the customers' debt obligations, and that the money held in escrow would then be used to pay the creditors.  The defendants further promised that MISSION would only charge a nominal monthly fee of $49 in exchange for its efforts, and they often explained that MISSION would charge an additional fee only if MISSION succeeded at obtaining a greater reduction in debt than what had been promised.

12.  For example, MISSION's sales representatives were instructed not to say anything about MISSION's fees unless specifically asked about them by prospective customers, at which point sales representatives were instructed to say that MISSION charged a "$49 administration fee" each month and that there would be an additional payment only "if we are successful at negotiating a better settlement than the 55% we promised you." A solicitation letter that MISSION sent to prospective customers similarly promised "no credit check or upfront fees" in exchange for the debt negotiation.  In truth and in fact, and as the

6

defendants well knew, MISSION charged not only approximately $49 per month, but also an up-front fee equal to 18% of the debt the customer owed.  MISSION deducted these fees from the monies that customers paid to a third party payment processor, in accordance with a monthly payment plan established by MISSION, and that customers understood would be held in escrow and ultimately used to pay their respective creditors.  Indeed, MISSION regularly took for itself the entirety of the funds that its customers set aside during the first three months of their contracts with MISSION -- money that customers believed would be paid to creditors -- so as to insure that the company would receive up-front fees before any of the customers' debt was even paid down.

### Lies About MISSION's Results

13.  MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, and others known and unknown, typically promised prospective customers that MISSION would negotiate a substantial reduction in debt for them, typically promising prospective customers that they would have to pay only 55% of the amount owed to creditors, i.e., a reduction of about 45%.  In truth and in fact, and as the defendants well knew, this promise was materially false and misleading because, among other things, (a) MISSION did little or no meaningful work to negotiate reductions in debt for many of its customers; and (b) the sort of result MISSION was

7

promising prospective customers was substantially more favorable than the results MISSION typically achieved for prior customers (many of whom terminated their relationships with MISSION after discovering that MISSION had lied about the fees it was charging).

### Lies About MISSION's Affiliations

14.   MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, and others known and unknown, made material misrepresentations about MISSION's relationships and affiliations in a deceptive effort to make MISSION seem more credible and trustworthy.  For example, in an effort to attract business, MISSION sent a solicitation letter to prospective customers that falsely suggested that MISSION was acting on behalf of or in connection with a federal governmental program.  Among other things, the letter included an image of the Great Seal of the United States and indicated that the letter was coming from the so-called "Reduction Plan Administrator" of the purported "Office of Disbursement."  However, the letter provided a phone number and address that were MISSION's alone and, in truth and in fact, and as the defendants well knew, MISSION did not have any relationship with any federal agency, nor was it operating in connection with any federal program.

15.   In the same way that MISSION falsely suggested an affiliation with the federal government, MISSION falsely suggested that it had a close relationship with one of the three leading credit bureaus in the United States ("Credit Bureau"). Specifically, MISSION's sales representatives were instructed to tell prospective customers that MISSION "works in direct correspondence with [the Credit Bureau]" and that MISSION had received the prospective customer's contact information (and other data) directly from the Credit Bureau.  In truth and in fact, and as the defendants well knew, MISSION did not have any relationship with the Credit Bureau, nor did MISSION obtain contact information from the Credit Bureau.

## Continued Lies

16.   Between 2009 and 2013, as MISSION's customers discovered that MISSION was taking up-front fees from them and otherwise acting contrary to the representations that MISSION and its employees had made to them, the customers filed numerous complaints with MISSION in person, by phone, by email, and otherwise.  Customers also filed numerous complaints with federal, state and local agencies, as well as better business bureaus, many of which in turn contacted MISSION regarding the complaints.  Sometimes, in an effort to quiet complaining customers, MISSION issued partial refunds.  Other times, MISSION refused to do so and defended its conduct by pointing to the

provisions of a contract that it had all of its customers sign – a contract that disclosed MISSION's fees but in confusing terms and that, in any event, MISSION's sales representatives often hurriedly directed customers to sign online or in person without first going over the terms with them.  Notwithstanding the litany of complaints that they received, MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, continued to maintain their false and fraudulent practices, in whole or in part.

<u>STATUTORY ALLEGATIONS</u>

17.   From at least in or about 2009 up to and including in or about April 2013, in the Southern District of New York and elsewhere, MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, and others known and unknown, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, to wit, the defendants engaged in a scheme to defraud customers of MISSION by, among other things, making misrepresentations about MISSION's fees, results, and affiliations.

18.   It was a part and an object of the conspiracy that MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN,

and MANUEL CRUZ, a/k/a "James Leon," the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and would and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers and would and did take and receive therefrom, such matters and things, and would and did knowingly cause to be delivered by mail and such carriers according to the directions thereon, and at the places at which they were directed to be delivered by the persons to whom they were addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

19.   It was further a part and object of the conspiracy that MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and

promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>OVERT ACTS</u>

20.   In furtherance of the conspiracy and to effect its illegal objects, MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about November 2012, MANUEL CRUZ, a/k/a "James Leon," represented to another person that MISSION's fees were just $49.99 a month.

b.   In or about early 2012, BORIS SHULMAN misrepresented the amount of MISSION's fees to a particular customer of MISSION.

c.   In or about 2011, DENNIS KURLYAND and MICHAEL LEVITIS caused a fraudulent and deceptive solicitation letter to be mailed to prospective customers on behalf of MISSION.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Mail Fraud)

The Grand Jury further charges:

21.   The allegations contained in paragraphs 1 through 16 and 20 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

22.   From at least in or about 2009 up to and including in or about April 2013, MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom, such matters and things, and did knowingly cause to be delivered by mail and such carriers, according to the directions thereon, and at the places at which they are directed to be delivered by the persons to whom they are addressed, such matters and things, to wit, the defendants engaged in a scheme to defraud customers of MISSION by, among other things, making

misrepresentations about MISSION's fees, results, and affiliations and, in doing so, caused mailings, including solicitation letters, to be made.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

23.  The allegations contained in paragraphs 1 through 16 and 20 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

24.  From at least in or about 2009 through in or about April 2013, in the Southern District of New York and elsewhere, MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendants engaged in a scheme to defraud customers of MISSION by, among other things, making misrepresentations about MISSION's fees, results, and affiliations and, in doing so, caused interstate

14

wires, including interstate telephone calls, to be made.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

25. As the result of committing the mail and wire fraud offenses, and conspiracy offenses, in violation of Title 18, United States Code, Sections 1349, 1343, and 1341, alleged in Counts One through Three of this Indictment, MISSION, MICHAEL LEVITIS, DENIS KURLYAND, BORIS SHULMAN, and MANUEL CRUZ, a/k/a "James Leon," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to the following:

a. At least $2,196,522 in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained as a result of the offenses for which the defendants are jointly and severally liable.

b. Any and all United States currency, funds or other monetary instruments credited to the following accounts:

i. J.P. Morgan Chase Account No. 809315351, in the name of Mission Abstract LLC d/b/a Mission Settlement Agency;

ii.   J.P. Morgan Chase Account Nos. 791501276566, 791005536565, 4970270130 in the name of Eva Levitis;

iii.   Citibank Account No. 42777002, in the name of Eva Levitis;

iv.   J.P. Morgan Chase Account No. 103073080765, in the name of Faye Levitis;

v.   Citibank Account No. 4970301582, in the name of Faye Levitis;

vi.   J.P. Morgan Chase Account Nos. 803568195, 910271519, 839043130, 809316706, in the name of Influential Division Corporation;

vii.   J.P. Morgan Chase Account Nos. ending in 0514 and 5009, in the name of Influential Enterprises;

viii.   J.P. Morgan Chase Account Nos. 791501275565, 052074897765, in the name of Law Office of Michael Levitis;

ix.   J.P. Morgan Chase Account No. 892694589, in the name of Madison Capital Agency Inc.;

x.   Citibank Account No. 42777002, in the name of Michael Levitis and Marina Levitis;

xi.   J.P. Morgan Chase Account No. 791004723465, in the name of Michael Levitis and Marina Levitis;

xii.   J.P. Morgan Chase Account No. 808126403, in the name of Mission Marketing Center 102, Inc.;

xiii.   Capital One Account No. 7164001369, in the name of AAMI Restaurant;

xiv.   J.P Morgan Chase Account No. 839230539, in the name of Susan V. Consulting;

xv.   J.P. Morgan Chase Account No. 751419102, in the name of Vermar Management LLC;

xvi.   TD Bank Account No. 373979178, in the name of YGIK, Inc.;

xvii.   J.P. Morgan Chase Account No. 828330514, in the name of Denis Kurlyand;

c.   The defendants' interest in the following property:

i.   RASPUTIN, a restaurant/nightclub located at 2670 Coney Island Avenue, Brooklyn, New York;

ii.   all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 132 Norfolk Street, Brooklyn, New York 11235;

iii.   all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1001 Oriental Boulevard, Brooklyn, New York 11235.

## Substitute Asset Provision

26.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants,

     a.   cannot be located upon the exercise of due diligence;

     b.   has been transferred or sold to, or deposited with, a third person;

     c.   has been placed beyond the jurisdiction of the Court;

     d.   has been substantially diminished in value; or

     e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above, including but not limited to the defendants' interest in the following property:

     i.     RASPUTIN, a restaurant/nightclub located at 2670 Coney Island Avenue, Brooklyn, New York;

     ii.    all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 132 Norfolk Street, Brooklyn, New York 11235;

iii.      all that lot or parcel of land, together

with its buildings, appurtenances, improvements, fixtures,

attachments and easements, located at 1001 Oriental Boulevard,

Brooklyn, New York 11235.

.(Title 18, United States Code, Section 981(a)(1)(C);
     Title 21, United States Code, Section 853(p);
     and Title 28, United States Code, Section 2461.)


*Kathleen Ruoich*

FOREPERSON


*Preet Bharara*

PREET BHARARA
United States Attorney


19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MISSION SETTLEMENT AGENCY,
a/k/a "Mission Abstract LLC,"
a/k/a "Alpha Debt Settlement,"
MICHAEL LEVITIS,
DENIS KURLYAND,
BORIS SHULMAN, and
MANUEL CRUZ,
a/k/a "James Leon,"

Defendants.

SEALED INDICTMENT

13 Cr.

(18 U.S.C. §§ 1349, 1341, 1343, and 2)

PREET BHARARA
United States Attorney.

A TRUE BILL

*Kathleen Surick*
Foreperson.

# Exhibit B



**Office of Disbursement**
*292 Madison Ave, 22nd floor*
*New York, NY  10017*



PRESORTED
STANDARD

U.S. POSTAGE
PITNEY BOWES

02 1R
0002097321   $ 00.24
MAY 18 201
MAILED FROM ZIP CODE 9205

*Time Sensitive Documents - Please Open Immediately*

12905
2691





FORM-DR420A                                    2012

| Consumer Contact Info | Company Contact Info |
|---|---|
| Name: ▓▓▓▓▓▓ | Name: Mission Agency |
| Address: ▓▓▓▓▓▓ | Phone: (800) 404-7531 |
| ▓▓▓▓▓▓ | Hours: Mon-Fri - 10a-10p EST |

| Estimated Balance: $12,767 | Estimated Savings: $7,660 | Reference: 205422 |
|---|---|---|

Due to possible changes in your financial situation, we are sending you this letter to offer you a program that can reduce your debt (including credit card debt) by up to 60 percent less than you currently owe.

If you are having difficulty making full monthly payments, contact us at (800) 404-7531 for a free no obligation consultation.

We will negotiate with your creditors and make arrangements to settle your existing debts for less that you currently owe, which can save you thousands.

We request that you seriously consider this offer and contact us at (800) 404-7531 to discuss the terms of this program.

This offer is being made available to a limited number of consumers and no other attempts will be made to contact you. Please contact us immediately at (800) 404-7531.

Sincerely,

*Jeffry Brooks*

Reduction Plan Administrator

This will be your only notification and failure to respond will result in cancellation of your eligibility status

No Credit Check or Upfront Fees
A 5-minute call could save you thousands
Debt free in as little as 12 months

# Exhibit C

pitch

Hello ____!!!!(always assume its the person) This is _____ from Mission Debt Settlement. How are you doing today? The reason for my phone call is we work in direct correspondence with Experian Credit Bureau I received your file earlier today due to a high amount of unsecured debt in the amount of _____ and a declining credit score of _____.

My job is to provide you with a program that will get you completely debt free in 1-5 years. The way our program works is we have a team of attorneys and debt arbitrators that will negotiate your high interest rate debt down to 55 cents on the dollar. So when you enroll with lifeguard financial your debt will be settled at _____. let me ask you how much is costing you per month to keep up with this debt? (ballpark figure, if amount is unknown refer to savings calculator)

if I were to put you into a ____ month program your new monthly payment with all of our fees included will be _____ (saving you _____ per month) and if you do the math over the _____ months you will be saving a total of $_____

## CLOSE (Option 1)

As a convenience to you we set up and automatic withdrawal from your checking/ savings account and we let you pick the day of the month that is most convenient for you that way it goes with your pay schedule.
What day of the month will be best for you? (wait for response)
who do you do your banking with? And the account number is? And the routing number? Okay what I need you to do is to void out the next check in your check book and post date it for the day of( first payment withdrawal) please keep in mind it will be on the same day every month until the program is completed.

## CLOSE(Option 2)

what we do for our clients is a full analytical review of your credit report it is something you should do once a year, and it is free of charge no obligation!!!!(emphasize) we will go over it line for line and recommend what you should include in the program. In order to determine the exact amount of your debt how much each creditor shows as far as a total balance your monthly minimum payments and weather its delinquent or not is to pull your credit report, it will take me between 10-15 minutes but for your protection we must ask for your permission to proceed. I will share with you everything that is on the report and will list the various accounts arrive at a total and I will advice you at the amount that we can settle it for and we will come up with an affordable, INTEREST FREE!!! monthly payment that will eliminate all your unsecured debt and bring your credit score back to where it was before you got into this debt.
Permission granted:
  - what is the correct spelling of your full name
  - are you married or single
  - is this debt individual or for you and your spouse
  - and your mailing address
  - what is your date of birth?
  - And your social security number is?
    (pull credit report)
while I am pulling up your credit report as a convenience to you we will set up and automatic withdrawal with your savings or checking account and we will let you pick the day which is most convenient for you. I am going to pull your credit report, in the mean time think of what day you want your payment pulled, and have your acct information available.

<u>REBUTTALS</u>

**How did you get my information?**

We work in correspondence with Experian Credit Bureau. Our office receives files every week of individuals that have a high unsecured debt amount and a declining credit score. The files also indicate a potential need for debt relief with credit cards or mortgage payments.

**I don't have that debt.**

The figure would be a combination of total unsecured debt. That could be credit cards, medical bills, or personal loans. Occasionally there is a data entry error or a debt you are not aware of. What would you say is a more accurate number?

**How do I know you're legitimate?** *www. mission agency . net*

Please write down _____ You will see that we are an A rated company with the BBB and many other questions can be answered there. Also, before any action is taken on your file, an agreement is sent to you with full disclosure and specific performance documented. You will become comfortable with us before committing to anything.

**I want to pay what I owe.**

That's a noble concept. Wouldn't it be great if we could just pay what we owed and not be burdened with interest payments that go on forever?
Keep in mind: every 10 thousand dollars of debt takes years and years to pay off if just minimum payments are made. The creditors today are content to get the settled amount in light of all the bankruptcies, charge offs and bad debt out there today.

**Sounds too good to be true.**

I hear that a lot. It is, in fact, a great program; but I should mention that there are trade-offs with this process. While getting you completely out of debt and raising your credit score during this period, in the beginning your credit score goes down for a few months and the creditors are allowed by law to continue to contact you and harass you for payment. One must accept the good with the bad.

**I need to talk to my lawyer.**

Not a problem.  In fact, why don't I prepare the Service Agreement that is signature-ready and then we can all address any questions or areas that need clarifying?  Your attorney will appreciate having the actual document to review.

**What if your company goes out of business?**

Our company and the company managing your trust account are insured by the FDIC.  All monies would be returned to you.  I
Quite frankly, however, we've been in business for a very long time and are solid enough to remain that way.

**Is there a pre-payment penalty?**

No.  In fact, you will save the $49 monthly administration fee for each month you pay down.  It is recommended, however, that a track record of several months on-time payments be established so we may help with the credit restoration process.

**Will I be responsible for taxes on the savings?**

That's an astute question.  The tax liability is waived in a lot of cases of debt settlement due to financial hardship.  This is what we endeavor to establish. The worst case scenario has been a maximum of an 18% tax on the amount of savings.  Doing the math, however, you'll see that cutting the debt almost in half, paying it off interest-free with a nominal administration fee, you are still way ahead.

**I need to think about it.**

You _should_ think about your options at this point. You need to understand that you can: 1) Go bankrupt  2) Continue making minimum payments for years and years to come  3) Win the lottery  4) Let us settle these debts and improve your credit score.  I can best be of service to you by preparing the documents for your review as if they are signature-ready.  By reviewing them and our web site the decision should be obvious.

**I need to talk to my spouse.**

Ok.  I hear that sometimes. But do you think your spouse would object to a solid financial decision that will save your household thousands of dollars?  As a practical matter, you've got time to review the paperwork together before anything is finalized and it makes more sense to get the process started for you.

**What will happen to my credit?**

Good question. To describe what happens we use the phrase "You have to take one step backwards in order to take three steps forward".
Your credit score will go down in the short term while the accounts are put into position for settlement. Then your score will go up as the payments are made and ultimately your score will be significantly higher.
Incidentally, your score now is_____. That score needs to improve for any major credit purchases and the only way you are going to achieve that is to eliminate the high amount of debt you have now. This is definitely a step in the right direction.

**I can settle these debts myself.**

You can certainly try, but keep in mind that the creditors have no real motivation to settle with you on an individual basis. They prefer to keep you in the loop as an interest-paying cash cow.
We are successful at settling these debts for our customers because we bring to the table multiple accounts at a time and large amounts of money changes hands.
I'll use the car buying example: Is a dealer going to give you a better deal on one car or on 50 cars?

**What's my guarantee?**

We put into writing everything that we commit to do. You will receive a Service Agreement that details our obligation to you and we provide full disclosure of all fees and all eventualities regarding your debt settlement. Our reputation as an A rated company with the BBB is on the line with every new client. You will be satisfied.

**How does your company get paid?**

We calculate a $49 administration fee that is included in your monthly payment. That money is dispersed to the attorneys, debt arbitrators, office staff and expenses. Additionally, if we are successful at negotiating a better settlement than the 55% we promised you, the difference benefits our company. Conversely, we will eat the additional amount if it is over 55%.

**What if a creditor won't settle?**

That is a rare occurrence and we typically will know right away. We will either absorb the difference or not enroll that specific creditor.

### I am not interested.

Well _____, interest is based on performance and I haven't done anything for you yet.  If you will just give me 60 seconds of your time I can give you enough information for you to make an intelligent decision that would reduce your unsecured debt by 45% and improve your credit score.  That should interest you!  I'll be brief.

### I am refinancing my home.

I wish I could say something to benefit you there, but based on the financial profile I have, along with a below-average credit score, I wouldn't be optimistic about your chances of a refinance.  My suggestion would be to make some major inroads in eliminating this unsecured debt and improving your credit score first.  We can do that for you.

### Can I be sued by a creditor?

It's always possible to be sued within our legal system.  However, with a financial hardship case our attorneys will represent you and still settle the debt. It doesn't make sense for a creditor to go through the entire suit process for one account, especially when you are so capably represented by our attorneys.